UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

FLOORING ASSOCIATES, INC.,

Plaintiff,

v.

DESIGN MANUFACTURING
INTERNATIONAL, LLC., and
CAVAN CARPETS, *the assumed
business name of Design
Manufacturing International, LLC*,

Defendant.

CASE NO. 2:20-cv-00057-JCC-JRC

REPORT AND RECOMMENDATION

NOTED FOR: April 16, 2021

The District Court has referred this matter to United States Magistrate Judge J. Richard Creatura pursuant to 28 U.S.C. § 636(b)(1)(A)–(B) and local Magistrate Judge Rules 1, 3, and 4. Before the Court are defendant's motions for summary judgment dismissal of plaintiff's complaint (Dkt. 59), to strike an expert declaration (Dkt. 77), and to strike a sur-reply (Dkt. 85). Defendant requests oral argument. *See* Dkt. 59, at 1; Dkt. 77, at 1.

1       This case arises from a dispute between plaintiff, a Washington-based floor coverings

2   merchant, and defendant, a rug importer operating under the name Cavan Carpets,[1] over rugs

3   that plaintiff purchased from defendant to sell for use in Nordstrom stores.  Rugs purchased as

4   early as September 2015 had issues.  The parties dispute whether that failure was due to

5   manufacturing defects or improper cleaning and use in high traffic store areas.  Claiming

6   manufacturing defects, plaintiff brings suit against defendant for breach of contract, breach of

7   express warranty, and breach of the implied warranty of merchantability.

8       Defendant moves for summary judgment dismissal.  Oral argument is not necessary

9   before issuing this report and recommendation.  *See* Local Civil Rule ("LCR") 7(b)(4).  The

10  Court recommends granting in part and denying in part the summary judgment motion.  The

11  Court finds that there are genuine issues of fact pertaining to whether the rugs had manufacturing

12  defects or were damaged by cleaning equipment and use in high traffic areas.  These factual

13  issues are material to plaintiff's claims and bar summary judgment dismissal of most of

14  plaintiff's claims.  However, the Court does recommend granting the request to strike contained

15  in the summary judgment motion and addressing plaintiff's evidence of damages in the form of

16  lost future profits and sales.

17      Intertwined with these factual disputes are also defendant's motions to strike plaintiff's

18  expert's testimony and plaintiff's sur-reply.  The Court grants the motion to strike the expert's

19  testimony but only for purposes of issuing a recommendation on the summary judgment motion.

20  Dkt. 77.  The motion to strike the sur-reply is stricken because it is improper.  Dkt. 85.

21  ///

22  ///

23

24  [1] DMI, operating as Cavan Carpets, is referred to as "defendant" herein.

REPORT AND RECOMMENDATION - 2

# BACKGROUND

## I. Allegations of the Complaint and Removal

Plaintiff brought this matter in Washington State court in October 2019.  Dkt. 1-1, at 2.
Plaintiff alleges that rugs it purchased from defendant were defective, that plaintiff expended its
own time and money to correct those defects, and that plaintiff and defendant then worked
together to create an improved product "in part because [defendant] blamed the original product
specifications . . . and not poor manufacturing."  Dkt. 1-1, at 4.  But, plaintiff alleges, the rugs
manufactured to follow the "improved" specifications continued to fail, since the fabrication
quality of the subsequently manufactured rugs did not match the fabrication quality of the
"improved" specification examples.  *See* Dkt. 1-1, at 4.  Plaintiff alleges that it has suffered lost
sales and loss of valued customers as a result.  Dkt. 1-1, at 4.  In the complaint, plaintiff alleges
damages for lost sales, lost profits, mitigation expenses, cover, and other damages for a total of
$862,092.  Dkt. 1-1, at 5.

Defendant's attorney filed a notice of appearance in state court on January 9, 2020.  Dkt.
3-1, at 17.  On January 13, 2020, defendant filed a notice of removal from state court in this
Court.  Dkt. 1.  The matter was assigned to U.S. District Court Judge John C. Coughenour and
referred to the undersigned.  Dkt. 7.  Defendant filed the answer, and a jury trial in this matter is
currently set for May 17, 2021.  Dkt. 43.

## II. Summary Judgment Motion

### A. Defendant's Evidence

On February 4, 2021, defendant filed the pending summary judgment motion.  Dkt. 59.
Defendant relies on declarations from its expert, Marty Chagnovich, (Dkt. 64) and from founders
Daniel J. McGovern, Jr. ("McGovern, Jr.") and Daniel F. McGovern ("McGovern, Sr.") (Dkts.

63, 65; *see also* Dkt. 63, at 2, 4), as well as excerpts from depositions of Nordstrom staff Karen

Hogan (Dkt. 69) and Matthew Johnson (Dkt. 70) and other evidence, including correspondence

between Nordstrom and plaintiff that defendant obtained during discovery in this matter.

Defendant asserts that it is an importer of handmade rugs that sells to the "high end

residential design market." Dkt. 63, at 2. Defendant primarily sells "hand-loomed" carpets and

area rugs, although it also sells some "hand-tufted" and machine-made styles. Dkt. 63, at 2.

McGovern, Jr., explains the process of manufacturing a hand-loomed rug (which is hand

woven). Dkt. 63, at 4. After two backings are added to the rug with latex adhesive, "serging"

yarn is sewn around the edge as part of the "serging" process. *See* Dkt. 63, at 4–5. In contrast, a

hand-tufted rug is created partially by hand and partially using a "tufting gun," which pushes

yarn into the fabric. Dkt. 63, at 4. "In commercial settings, hand-tufted rugs are typically the

rug of choice because of their strength and high traffic durability," according to McGovern, Jr.

Dkt. 63, at 4. Indeed, McGovern, Sr., asserts that he would recommend a hand-tufted—not

hand-loomed—rug for a high-traffic area surrounded by hard flooring and cleaned with

commercial cleaning equipment, such as the equipment that Nordstrom uses. Dkt. 65, at 4. And

McGovern, Jr., states that "[t]he limited capabilities of hand looming will not allow the carpets

and rugs to withstand the stress of brushes and machinery." Dkt. 63, at 7.

Both McGoverns assert that in 2015, without their knowledge, Scott Razor (one of

plaintiff's principals) provided Nordstrom and its design consultant with samples of one of

defendant's hand-loomed rugs. Dkt. 63, at 5; Dkt. 65, at 5. Razor later called McGovern, Jr., to

ask for new samples of this rug in some custom colors. Dkt. 63, at 5. From October 2015 to

May 2016, plaintiff made six purchases of these rugs from defendant to sell to Nordstrom. Dkt.

63, at 6.

1    Issues began to arise soon after.  In June 2016, Nordstrom staff emailed Karen Hogan

2  about issues with the rugs "coming apart at the corners" (Dkt. 69, at 20; *see also* Dkt. 69, at 25),

3  and Hogan reached out to Razor about these issues.  Dkt. 69, at 25.  It appears that Razor reached

4  out to McGovern, Sr., because later in June, McGovern, Sr., texted Razor saying that it was not

5  clear "what else besides serging can be done on handloomed.  Hand tufted[,] we can turn the

6  excess cloth under[,] but you will see the white from the side[,] but it may not be objectionable."

7  Dkt. 65-1, at 2.  In the same conversation, McGovern, Sr., asked if the rugs were being used in

8  heavy traffic areas, but Razor replied that they were being used in departments—medium traffic

9  areas—not "main traffic [i]sles."  Dkt. 65-1, at 3.  McGovern, Sr., asserts that he "later learned

10  this was false."  Dkt. 65, at 5.

11    Also in June 2016, plaintiff inquired with McGovern, Jr., regarding whether defendant

12  had any "cleaning warranty information sheet" to send to Nordstrom's design consultant.  *See*

13  Dkt. 63, at 6.  McGovern, Jr., passed along cleaning instructions from defendant's website but

14  advised plaintiff that defendant did not provide a written warranty on its hand-made rugs.  Dkt.

15  63, at 6; Dkt. 63-1, at 2–3.  In July 2016, plaintiff purchased yarn from defendant to use to repair

16  certain rugs.  *See* Dkt. 63, at 7.

17    Then, on September 14, 2016, Razor provided new specifications for the rugs:  he

18  requested that "on all future Nordstrom rug orders" "we round the corners" because the "square

19  corners are getting beat up in the stores, likely by their machinery."  Dkt. 63-7, at 2.  Both

20  McGovern, Jr., and Sr., assert that they did not make any warranties or promises about whether

21  these rounded corners would solve the issues "caused by Nordstrom's commercial [cleaning

22  equipment]."  Dkt. 63, at 7–8; Dkt. 65, at 6.

23

24

1      Shortly thereafter, on September 16, 2016, Razor emailed McGovern, Jr., regarding the

2  repairs to existing rugs.  Dkt. 63-4, at 3.  McGovern, Jr., responded that from the photographs he

3  had seen, it appeared that "there are 2 or 3 corners that were eaten up pretty badly by the

4  vacuum."  Dkt. 63-4, at 3.  McGovern, Jr., inquired whether the corners could be rounded off and

5  recommended speaking to the cleaning crew.  Dkt. 63-4, at 3; *but see* Dkt. 63, at 8 ("In fact,

6  rounding the corners on a hand-loomed rug would not prevent the fraying of the corners caused

7  by" cleaning equipment).  It appears that at this point, there had been some suggestion of

8  manufacturing defects, because McGovern, Jr., also wrote—

9             Whoever told you that the rugs haven't been vacuum[ed] yet and the corners
             are already balding is either 1 – not telling the truth, or 2 – the warehouse people
10      that are opening these packages are using blades on the plastic and the blades are
             going through and cutting the serging.  I can bet and say will [sic] 99.9999%
11      certainty that this is the cause of most if not all of these issues. . . .
             This has nothing to do with loomed carpet, I bet that I am correct in saying
12      that it is the warehouse guys opening it.

13  Dkt. 63-4, at 3; *but see* Dkt. 63, at 7 ("Scott Razor never indicated that he felt the damage was

14  caused by Cavan's manufacturing of the rugs.").  In response, Razor agreed "that it has to be the

15  vacuums, however, the hand-tufted rugs seem to be able to endure the abuse much better."  Dkt.

16  63-4, at 2.

17      In November 2016, Razor again e-mailed McGovern, Jr., regarding new rug

18  specifications.  Dkt. 63, at 8.  In addition to re-iterating that all new Nordstrom rugs were to have

19  rounded corners, Razor requested (if possible) "tightened up s[e]rging that would be less

20  vulnerable to power cleaning equipment[.]"  Dkt. 63, at 8; *see also* Dkt. 63-8, at 2.  McGovern,

21  Jr., responded that defendant would "do whatever we can with the hand serging" but that

22  defendant was "limited to what can be done. . . ."  Dkt. 63-8, at 2.  In fact, McGovern, Jr., states

23

24

1  that on defendant's hand-loomed rugs, the stitches were already spaced a quarter inch apart and

2  could not be closer.  Dkt. 63, at 5.

3          Subsequently, more purchase orders were placed for rugs with rounded corners.  Dkt. 63,

4  at 8.  Later, Nordstrom requested slightly less round corners, and defendant complied with these

5  specifications.  *See* Dkt. 63, at 10; Dkt. 69, at 28.

6          In January 2017, McGovern, Jr., states that Razor again communicated new

7  specifications, this time asking that the rugs be made with heavier yarn.  Dkt. 63, at 9.

8  McGovern, Jr., asserts that he never made any warranty that the heavier weight yarn would solve

9  the issues caused by Nordstrom's cleaning equipment.  Dkt. 63, at 10.  In late January 2017,

10  Razor ordered two three-foot square rug samples made with the heavier yarn and rounded

11  corners, which were, according to defendant, manufactured with the same edge serging as

12  defendant had previously used.  Dkt. 63, at 9.  During this time, and throughout 2017, defendant

13  also fulfilled additional purchase orders for rugs with heavier yarn, rounded corners, and the

14  strongest serging possible.  Dkt. 63, at 9–10.

15          McGovern, Jr., asserts that throughout this time, neither he nor anyone else with

16  defendant told plaintiff that rug serging would be improved (since it was impossible to make the

17  stitching tighter).  *See* Dkt. 63, at 10.  In April 2017, Razor emailed Hogan saying that the new

18  rugs had improved serging that was "more tightly wrapped" and "tucked under as far as

19  possible."  Dkt. 63, at 10; *see also* Dkt. 60-7, at 2.  However, not only does McGovern, Jr., point

20  to his statement that serging was "limited to what can be done" (Dkt. 63, at 10; *see also* Dkt. 63-

21  8, at 2), but he also asserts that it is impossible to tuck fabric under the edges of a hand-loomed

22  rug.  Dkt. 63, at 10.

23

24

1        During early 2017, Nordstrom continued have issues with defendant's rugs.  In March

2    2017, Razor emailed a person who appears to be a Nordstrom employee, referencing that both

3    rugs manufactured by defendant and by another company in one store were having issues.  *See*

4    Dkt. 70, at 10.  And in April 2017, a manager at a store in Texas complained of issues with

5    corner tears on a rug.  *See* Dkt. 69, at 15.  In January 2018, Nordstrom cancelled all fall 2018

6    orders from defendant due to "quality control" issues—specifically that "[w]e had thought we

7    had this worked out with the changed spec for 2017, but the rugs are as challenging as ever."

8    Dkt. 60-8, at 2–3.

9        According to the McGoverns, Razor first notified them in February 2018 that seven

10   Nordstrom stores had issues with defendant's rugs fraying on the edges.  *See* Dkt. 63, at 11; *see*

11   *also* Dkt. 65, at 6.  McGovern, Sr., states that he then traveled to a Maryland store, where he

12   observed that one of the rugs "was adjacent to a main aisle," which was a hard floor, and that

13   "the edges of the rug that touched the main traffic aisle w[ere] frayed" and "wet to the touch"

14   because a cleaning machine was clearly being run over the edges of the rug.  Dkt. 65, at 6.  In

15   contrast to this rug, which was in perfect condition "except at the edges where it met the marble

16   floor," other hand-loomed rugs with fixtures over them, in product areas, "were in perfect

17   condition with no frayed edges."  Dkt. 65, at 6–7.  McGovern, Sr., states that he also observed

18   machine-tufted guns from another company that had similarly frayed edges.  Dkt. 65, at 7.

19   According to McGovern, Sr., Razor "agreed with me" that the damage was attributable to

20   cleaning equipment.  Dkt. 65, at 7.  And McGovern, Sr., states that he refused to sell additional

21   hand-loomed rugs unless Razor "upgraded his specification to a rug product that could

22   withstand" the cleaning equipment.  Dkt. 65, at 7.

23

24

1    The relationship between the parties continued to unravel.  According to McGovern, Sr.,

2    he met with Razor in November 2018, when Razor "agreed that the [cleaning equipment] used

3    by Nordstrom [was] damaging the rugs, but he still wanted [defendant] to help out with his

4    expenses[.]" Dkt. 65, at 7.  McGovern, Sr., asserts that Razor threatened that if defendant did not

5    pay "$75,000, he was going to sue us and his brother was an attorney and it would not cost him

6    anything to handle this, but it would cost [defendant] a lot of money to defend itself, even if we

7    win." Dkt. 65, at 8.

8                                    **B.  Plaintiff's Evidence**

9    In response to summary judgment, plaintiff relies on Razor's declaration (Dkt. 76), as

10    well as the declarations of former Nordstrom employee Janelle Schneider (Dkt. 74) and Michael

11    Andonian, principal of a rug cleaning and service company.  Dkt. 73.  Razor acknowledges that

12    at first, plaintiff and Nordstrom speculated that it was "likely" that cleaning equipment was

13    causing issues with the rugs.  However, Razor asserts that he "became aware of the fact that

14    these issues were present 'prior-to' use in the stores." Dkt. 76, at 2.   It took time for plaintiff to

15    realize that the issue "was present just behind the serging, not the serging itself." Dkt. 76, at 3.

16    Razor blames a "lack of adhesion and also cut-ends of the weaving that were visually present"

17    and not "integrated appropriately into the edge where the serging yarn was wrapped to protect

18    and seal the cut edges." Dkt. 76, at 3.

19    According to Razor, delay in discovering the true source of the issues happened because

20    plaintiff did not inspect rugs shipped directly to Nordstrom before installation.  Razor asserts that

21    he visited twelve stores to inspect and repair rugs, where he observed "the same issues store after

22    store"—rugs that were "split-open, delaminating, falling apart[,] and creating potential tripping

23    hazards." Dkt. 76, at 4.  Razor came to the conclusion that the cause of the problems was a

24

1    manufacturing defect because rugs exhibited issues "on sides that were not adjacent to 'hard

2    aisles'" or subject to cleaning equipment, rugs exhibited immediate performance issues in many

3    cases, and rugs shipped directly to Razor had issues.  Dkt. 76, at 2–3.  Razor states that no other

4    (i.e. non-Cavan) rugs in the stores had issues "of similar magnitude."  Dkt. 76, at 4.  Similarly,

5    the former Nordstrom employee asserts that she observed a rug that Nordstrom received at a

6    store and that was delivered in a flawed condition in September 2016.  Dkt. 74, at 2.

7            **C.  Other Filings**

8          In February 2021, defendant filed a motion to strike the Andonian declaration.  Dkt. 77.

9    Plaintiff responded by filing a sur-reply (Dkt. 83), and defendant then filed a motion to strike the

10    sur-reply.  Dkt. 85.  All pending motions are ripe for decision.

11                          **DISCUSSION**

12    **I.  Motion to Strike**

13          As a preliminary matter, the Court addresses defendant's motions to strike Andonian's

14    declaration and plaintiff's damages.  *See* Dkt. 59, at 28; Dkt. 77, at 1.  Defendant filed the motion

15    to strike Andonian's declaration separately from the summary judgment motion and included the

16    motion to strike damages as part of the summary judgment motion.

17            **A.  Andonian's Declaration**

18          In the separate motion to strike (Dkt. 77), defendant argues that plaintiff did not disclose

19    Andonian as an expert before filing the response to the summary judgment motion so that under

20    Federal Rule of Civil Procedure 37(c)(1), Andonian's declaration cannot be used as evidence in

21    opposition to the summary judgment motion.  Dkt. 77, at 7.

22          In response, plaintiff filed a sur-reply pointing out that defendant's motion to strike itself

23    failed to conform to Local Civil Rule 7(g).  *See* Dkt. 84, at 1.  Plaintiff's sur-reply is also

24

1   procedurally improper, as it was filed six days after the reply brief and motion to strike and the

2   sur-reply exceeds three pages.  *See* Local Civil Rule 7(g) (requiring a sur-reply to be filed within

3   five days of the reply brief and not exceed three pages).  And although defendant filed a motion

4   to strike the sur-reply, this, too is improper, because "[n]o response shall be filed [to a sur-reply]

5   unless requested by the court."  Local Civil Rule 7(g)(4).

6       Therefore, the Clerk shall strike the sur-reply addressing the motion to strike (Dkt. 84)

7   and the motion to strike the sur-reply (Dkt. 85).

8       This leaves defendant's motion to strike Andonian's declaration.  *See* Dkt. 77.

9   Regardless of whether the Court considers Andonian's testimony, for reasons discussed at length

10  below, the Court finds genuine issues of material fact preventing the Court from granting the

11  summary judgment motion.  Therefore, the Court's decision on the motion to strike Andonian's

12  testimony does not affect the outcome of the recommendation on the summary judgment motion.

13      Solely for purposes of deciding the summary judgment motion, the Court grants the

14  motion to strike Andonian's testimony.  The Court's decision in this regard does not address

15  whether plaintiff may rely on Andonian's testimony at trial—an issue to be addressed at a future

16  time by the trial court.  For purposes of the summary judgment motion, the Court notes that there

17  is good cause to strike Andonian's declaration.  Portions of Andonian's declaration are clearly

18  based on specialized knowledge beyond the scope of a lay person.  *See, e.g.*, *United States v.*

19  *Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (lay opinion testimony is "not to provide specialized

20  explanations or interpretations that an untrained layman could not make if perceiving the same

21  acts or events.").  Federal Rule of Civil Procedure 26(a)(2) required plaintiff to disclose by the

22  Court's deadline not only Andonian's name, but also either his written report (if he was retained

23  to provide expert testimony in the case) or at least, the subject matter of his testimony and a

24

1    summary of his facts and opinions to which he was expected to testify.  In this case, the deadline

2    to do so was no later than November 1, 2020.  *See* Dkt. 35.  But, on that date, plaintiff failed to

3    identify Andonian as a witness giving expert testimony and instead simply disclosed his name as

4    a third party "involved with the repair" of the rugs.  Dkt 40-1, at 8 (emphasis removed).

5         Therefore, the Court finds good cause to strike the declaration.  However, the trial court

6    should be the one to decide whether Andonian's testimony will be permitted at trial, and this

7    Court declines to rule on that issue. *See also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide

8    information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use

9    that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

10   failure . . . is harmless.").

11        **B.  Damages**

12        Defendant properly raises as part of the summary judgment motion an argument that

13   plaintiff's damages should be stricken.  Defendant maintains that plaintiff failed to provide

14   discovery regarding how it intended to prove the amounts claimed for lost future sales/lost

15   profits and mitigation/repair expenses.  *See* Dkt. 59, at 29.  Plaintiff does not respond to this

16   argument.  *See* Dkt. 71.  The Court recommends granting defendant's request regarding evidence

17   of lost future sales/lost profits and denying the request regarding mitigation and repair expenses.[2]

18        Federal Rule of Civil Procedure 26 required plaintiff to provide with its initial

19   disclosures "a computation of each category of damages claimed" and to "make available for

20   inspection and copying as under Rule 34 the documents or other evidentiary material, unless

21   privileged or protected from disclosure, on which each computation is based, including materials

22

23   _____

     [2] Because defendant's argument is made as part of the summary judgment motion, the
     undersigned issues a report and recommendation, rather than an order, on the request to strike

24   evidence of damages.

1    bearing on the nature and extent of injuries suffered[.]"  Fed. R. Civ. P. 26(a)(1)(A)(iii).  And

2    "Rule 26(e)(1)(A) requires disclosing parties to supplement their prior disclosures 'in a timely

3    manner' when the prior response is 'incomplete or incorrect.'"  *Hoffman v. Constr. Protective*

4    *Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), *as amended* (Sept. 16, 2008).  Finally, "'Rule

5    37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information

6    required to be disclosed by Rule 26(a) that is not properly disclosed.'"  *Id.* (quoting *Yeti by*

7    *Molly, Ltd. v. Deckers Outdoors Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).

8                              **1.  Lost Future Sales and Profits**

9          Plaintiff has not only failed to respond to defendant's arguments about striking lost

10   profits damages in the motion for summary judgment but has also failed to substantiate how it

11   arrived at its computation of lost profits and future sales damages.

12         The relevant part of plaintiff's Federal Rule of Civil Procedure 26 initial disclosures,

13   dated November 1, 2020, stated that plaintiff seeks "$1,207,863.87" for lost future sales and lost

14   profits between 2016 and 2019 and "$54,176.11" for mitigation and repair expenses.  Dkt. 40-1,

15   at 14.  The initial disclosures refer to attached exhibits for calculations of these amounts,

16   showing that plaintiff essentially calculated the difference between average profits before the rug

17   issues arose and after.  *See* Dkt. 40-1, at 19.

18         Regarding the lost sales and profits claims, however, the exhibit does not make clear

19   what documents formed the basis for plaintiff's calculations.  Nor was Razor able to explain how

20   he came up with these numbers in his deposition or to state with certainty that the documents did

21   not also include profits from sales of other products to Nordstrom.  *See* Dkt. 60-12, at 1–5.

22   Importantly, defendant's attorney asserted under penalty of perjury that although she demanded

23   that plaintiff make available records substantiating its alleged damages, as of November 9, 2020,

24

1  plaintiff had not made those documents available.  Dkt. 40, at 2.  In recent briefing to this Court

2  regarding whether the undersigned should recommend dismissal of the case as a sanction for

3  various discovery issues and rule violations, defendant's attorney stated that it was not until

4  November 16, 2020, that plaintiff's attorney responded to her requests for documents to

5  substantiate the lost profit figures.  *See* Dkt. 50, at 5.  Then, defendant's attorney claims,

6  plaintiff's attorney disclosed only tax returns and "three additional typed summaries called

7  'Payments to [plaintiff] from WF Floor Design 2012-2019' and '[Plaintiff] Sales of Other

8  Vendors to Nordstrom 2012-2017' and '[Plaintiff] Sales of Cavan Carpet to Nordstrom from

9  2016-2018.'"  Dkt. 50, at 5.  As of January 2021, defendant's attorney asserts that plaintiff's

10  attorney has not produced any information supplementing Razor's deposition testimony that he

11  could not explain how plaintiff's lost profits were calculated.  Dkt. 50, at 7.

12       In response, plaintiff's attorney maintained that he attempted to share the documents sent

13  on November 16, 2020, as early as November 13, 2020.  *See* Dkt. 54, at 1.  And plaintiff's

14  attorney argued that Razor's deposition was "his personal deposition and not that as the

15  corporate representative" of plaintiff.  Dkt. 53, at 5–6.

16       As noted above, even though defendant's attorney strenuously argues in the summary

17  judgment motion that plaintiff has never provided "information as to how its future lost

18  profits/lost sales have been calculated[] or produced or allowed inspection of any records on

19  which its future lost profits/lost sales are based" (Dkt. 59, at 29), plaintiff does not even attempt

20  to refute these arguments in response.  Not only does plaintiff fail to argue how the produced

21  documents support a claim for lost profits, but plaintiff has clearly failed to comply with its Rule

22  26 obligations.  The Court is not obligated to search the record to find support for plaintiff's

23  position.  Indeed, plaintiff's failure to respond to the motion to strike contained in the motion for

24

summary judgment may be deemed by this Court to be an admission that the motion to strike has

merit. *See* Local Civil Rule 7(b)(2); *see also* Federal Rule of Civil Procedure 56(e)(2) (failure to

respond to facts asserted in a summary judgment motion allows the Court to consider those facts

undisputed). The Court notes, moreover, a pattern in this litigation of plaintiff's attorney failing

to appropriately and timely comply with discovery obligations. *See, e.g.*, Dkts. 44, 47, 53.

Under Federal Rule of Civil Procedure 37, exclusion of evidence not disclosed is

appropriate unless the failure to disclose was substantially justified or harmless. *Yeti*, 259 F.3d at

1106. Here, plaintiff's attorney does not even attempt to argue how the failure to comply with

Rule 26(a)(1)(A)(iii) was substantially justified or is harmless. A court has discretion in this

situation to preclude presentation of undisclosed evidence of damages. *See Hoffman*, 541 F.3d at

1180.

For these reasons, the undersigned recommends that the District Court exercises its

discretion and order that plaintiff will be barred from arguing lost profits/lost sales based on

plaintiff's failure to show compliance with Federal Rule of Civil Procedure 26(a)(1)(A)(iii).

## 2. Expenses

Defendant also moves to strike plaintiff's claimed mitigation and repair expenses of

$54,176.11 for costs including travelling to stores to make repairs. *See* Dkt. 40-1, at 14.

Defendant claims that plaintiff has never come forward with the "actual receipts and invoices for

any of its expenses set out in its Exhibit B" (Dkt. 59, at 29)—the list of travel-related expenses,

outside services such as rug cleaning and repair, and costs of small tools and supplies and

materials that plaintiff relies on. Dkt. 40-1, at 21–40. Again, plaintiff's attorney fails to respond

to these arguments.

1        Defendant's attorney has previously raised issues regarding the travel expenses in this

2   Court.  *See* Dkt. 40, at 2; Dkt. 50, at 5–6.   After she did so, on January 14, 2021, defendant's

3   attorney alleges that plaintiff's attorney produced all new summaries, "eliminating all expenses

4   [that] it could not substantiate."  Dkt. 50, at 6.  Defendant's attorney objected that plaintiff had

5   provided "only American Express statements for its travel expenses and repair costs" and that

6   "typed summaries of its travel related expenses, payments to 'outside services' for alleged rug

7   repairs, costs of 'small tools' and 'Supplied Materials' without production of any of these

8   receipts or invoices is insufficient[.]"  Dkt. 50, at 8–9.  For its part, plaintiff asserted that the

9   amended version of Exhibit B removes "any expenses that [plaintiff] is unable to substantiate

10  with 100% certainty. . . ."  Dkt. 45, at 2.

11        Thus, it appears that plaintiff's attorney has reduced the amount sought in response to

12  defendant's objections; that plaintiff's attorney maintains that plaintiff is able to substantiate all

13  amounts claimed as mitigation and repair expenses; and that plaintiff has provided credit card

14  statements to substantiate at least some of these expenses.  Moreover, defendant does not provide

15  any authority or argument regarding why the credit card statements are inadequate or why the

16  reduced amounts cannot be substantiated.  Therefore, any issues with the persuasiveness of such

17  evidence goes to the weight of the evidence, and not its admissibility.  The undersigned

18  recommends that the Court deny defendant's motion to strike this evidence.

19                              **3.  Remaining Arguments**

20        Defendant also makes arguments regarding whether plaintiff's damages are overall

21  flawed because plaintiff has failed to show that lost profits resulted from misuse of cleaning

22  equipment rather than flaws in the rugs and because Nordstrom ceased purchasing rugs from

23

24

1    plaintiff for reasons unrelated to the quality of the rugs.  *See* Dkt. 59, at 29.  These arguments are

2    addressed below.

3    **II.  Summary Judgment Legal Standard**

4          Summary judgment is appropriate if a moving party shows that "there is no genuine

5    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

6    R. Civ. P. 56(a).  The materiality of a given fact is determined by the required elements of the

7    substantive law under which the claims are brought.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

8    242, 248 (1986).  When presented with a motion for summary judgment, the court shall review

9    the pleadings and evidence in the light most favorable to the nonmoving party.  *Anderson*, 477

10    U.S. at 255.  Weighing of evidence and drawing legitimate inferences from facts are jury

11    functions and not the function of the court.  *See United Steel Workers of Am. v. Phelps Dodge*

12    *Corps.*, 865 F.2d 1539, 1542 (9th Cir. 1989).  If the material evidence is in genuine dispute, a

13    motion for summary judgment dismissal should be denied.

14    **III.  Improper Service**

15          Defendant first argues in the summary judgment motion that this matter should be

16    dismissed without prejudice because plaintiff failed to properly effect service by serving

17    defendant with the summons and complaint. Dkt. 59, at 20. Plaintiff argues that because

18    defendant's attorney signed an acceptance of service on January 2, 2020, defendant waived any

19    such argument.  Dkt. 71, at 6.  The Court agrees with plaintiff.

20    **A.  Legal Standard**

21          Plaintiff argues that service was accomplished under state law, prior to removal.  "The

22    issue of the sufficiency of service of process prior to removal is strictly a state law issue[.]"  *Lee*

23

24

1    *v. City of Beaumont*, 12 F.3d 933, 936–37 (9th Cir. 1993), *overruled on other grounds by Cal.*

2    *Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008).

3         Washington Superior Court Rule 4(d) requires service of a summons and complaint,

4    which may be accomplished by personal service.  In Washington, as in federal court, proper

5    service of the summons and complaint is an essential prerequisite to obtaining personal

6    jurisdiction. *Scanlan v. Townsend*, 181 Wn. 2d 838, 847 (2014).

7              **B.  Parties' Evidence**

8         Here, defendant asserts that plaintiff did not file a summons when it initiated the matter in

9    King County Superior Court by filing the complaint.  *See* Dkt. 2, at 11 (defendant's attorney's

10   January 9, 2020, email to plaintiff's attorney stating that plaintiff never filed a summons).

11   According to defendant's counsel, on January 2, 2020, plaintiff's counsel sent a form acceptance

12   of service of the summons and complaint, but without a copy of either the complaint or a

13   summons.  *See* Dkt. 2, at 2; Dkt. 60, at 2.  Defendant's counsel states that the acceptance of

14   service had the wrong cause number and that plaintiff's counsel did not send a corrected

15   acceptance of service.  Dkt. 60, at 2.  On January 13, 2020, defendant removed the matter to

16   federal court.  Dkt. 1.

17        Plaintiff's attorney does not dispute that he failed to file a summons when it filed the

18   complaint in state court and did not serve the summons and complaint on defendant or its

19   attorney before removal.  Dkt. 71, at 2.  Plaintiff's attorney maintains that on "December 20,

20   2020" [sic], he sent an acceptance of service form to defendant's counsel via email, "which

21   followed [his] conversation with her in which she indicated that she had authority to accept

22   service and sign on behalf of" defendant.  Dkt. 72, at 1–2; *see also* Dkt. 72, at 5.  Plaintiff's

23   attorney did not receive a response and resent the acceptance of service form on January 2, 2020.

24

Dkt. 72, at 2; *see also* Dkt. 72, at 6.  He claims that defendant's attorney required changes before signing the form, including that defendant be given 60 days from the acceptance of service to appear and answer in the action.  Dkt. 72, at 2; *see also* Dkt. 72, at 9.  Plaintiff's attorney states that he made these changes and re-sent the form that day and that within a few minutes, defendant's attorney returned the signed acceptance of service form.  Dkt. 72, at 2; *see also* Dkt. 72, at 7.  She also forwarded the signed form to her client's representative.  Dkt. 72, at 2; *see also* Dkt. 72, at 12.

Then, according to plaintiff's counsel, on January 9, 2020, defendant's counsel claimed that she noticed that the acceptance of service had the wrong cause number and requested a corrected version of the acceptance of service, which she would "sign . . . again" and return.  Dkt. 72 at 2; *see also* Dkt. 72, at 12.

### C.  Analysis

Notably, in the reply in support of summary judgment, defendant's attorney does not dispute that she did, in fact, sign the acceptance of service form (albeit with the wrong cause number) on January 2, 2020.  *See* Dkt. 79, at 2.  Instead, she argues that an acceptance of service is not a waiver of service—that is, she contends that her acceptance of service on behalf of defendant did not relieve plaintiff from the obligation of serving a summons or complaint.  Dkt. 79, at 2.

Plaintiff has provided the notice of acceptance that defense counsel signed on January 2, 2020.  Dkt. 90, at 5–6.  This acceptance of service states that defense counsel "as attorney for and on behalf of" DMI and Cavan Carpets "hereby accept[s] service of copies of the Summons and Complaint, and the Order Setting Civil Case Schedule, in the within entitled proceeding. . . ."  Dkt. 90, at 6.  The acceptance of service specifically includes that defense counsel "hereby

1    waive[s] any and all deficiencies, defects, or irregularities with respect to the method or manner

2    of this service." Dkt. 90, at 6.

3         In Washington, by agreement, the parties can agree to confer personal jurisdiction where

4    it would otherwise be deficient. *Voicelink Data Serv., Inc. v. Datapulse, Inc.*, 86 Wn. App. 613,

5    620 (1997). For instance, in *Gunderson v. Gunderson*, an acceptance of service conferred

6    personal jurisdiction even where under Washington Superior Court Rule 4, the service was

7    invalid, because the acceptance of service specifically included consent to personal jurisdiction.

8    123 Wn. App. 1035, 2004 WL 2211579, at *3 (2004). And in *Copeland Planned Futures, Inc.,*

9    *v. Obenchain*, a Washington appellate court held that even where a summons had not been

10    personally served on a defendant, a defendant could consent to personal jurisdiction. *See* 9 Wn.

11    App. 32, 34, 36 (1973), *cited in* 3A Wash. Prac., Rules Practice CR 4 (6th ed.) ("Where consent

12    dispensing with service of summons[] has been given, service of summons is not required.").

13         Plaintiff has come forward with evidence that despite not having received the summons

14    and complaint, defendant's attorney, acting on defendant's behalf and with its authority, stated

15    that she accepted service of the summons and complaint and waived all deficiencies regarding

16    that service. *See* Dkt. 90, at 6. This is evidence from which one could reasonably find that

17    defendant agreed to the exercise of personal jurisdiction notwithstanding the failure to provide

18    the summons and complaint to defendant. Therefore, the summary judgment motion should be

19    denied inasmuch as defendant seeks dismissal of the matter for lack of personal jurisdiction.

20    **IV. Failure to Assert Manufacturing Defects Earlier**

21         Defendant next argues that "[w]hen one party performs under [a] contract, and the other

22    party accepts his performance without objection, it is assumed that such performance was the

23    performance contemplated by the contract." Dkt. 59, at 22. Therefore, defendant argues,

24

1    plaintiff's acceptance of the rugs bars plaintiff from bringing a breach of contract action now.

2    Dkt. 59, at 23.  Plaintiff does not respond to this argument.

3        Defendant cites a principle of law from a Washington case involving a contract for

4    performance of services.  *See Evans v. Laurin*, 70 Wash. 2d 72, 73, 76 (1966).  But this case

5    involves the sale of goods, and the Court looks to the provisions of the Uniform Commercial

6    Code ("UCC"), RCW 62.A.  The applicable rule regarding notice of breach is supplied by a

7    portion of the UCC, RCW 62A.2-607(2)–(3)(a), which provides—

8            (2) Acceptance of goods by the buyer precludes rejection of the goods
         accepted and if made with knowledge of a nonconformity cannot be revoked
9        because of it unless the acceptance was on the reasonable assumption that the
         nonconformity would be seasonably cured but acceptance does not of itself impair
10       any other remedy provided by this Article for nonconformity.
             (3) Where a tender has been accepted:
11               (a) *The buyer must within a reasonable time after he or she
         discovers or should have discovered any breach notify the seller of breach
12       or be barred from any remedy.*

13   (Emphasis added.)  This provision required plaintiff to notify defendant of issues with the rugs

14   within a reasonable time after plaintiff discovered—or should have discovered—the issues.  *See*

15   *Jarstad v. Tacoma Outdoor Recreation, Inc.*, 10 Wn. App. 551, 557 (1974).

16       A "reasonable time" "depends on the nature, purpose, and circumstances of the action."

17   RCW 62A.1-205(a).  "What may be considered a reasonable time is usually a mixed question of

18   law and fact to be determined by the trier of fact[.]"  *Jarstad*, 10 Wn. App. at 558; *see also*

19   *Jeffries v. Clark's Rest. Enters., Inc.*, 20 Wn. App. 428, 431 (1978).  Moreover, "the time of

20   notification is to be determined by applying commercial standards to a merchant buyer."  RCW

21   62A.2-607 cmt. 4.

22       Here, defendant comes forward with no evidence of the applicable commercial standards,

23   which, standing alone, merits denial of its motion in this regard.  *See* Dkt. 79, at 4.  Separately,

24

1  the Court notes that factual disputes on this point are also readily apparent.  Defendant asserts

2  that plaintiff unreasonably waited more than three years after the first purchase order on October

3  29, 2015, and claims that Razor (one of plaintiff's principals) knew of the problems with hand-

4  loomed rugs in one store as early as June 2016, yet waited until November 2018 to assert a

5  manufacturing defect was to blame.  *See* Dkt. 79, at 4.

6          But, according to Razor, it took time for plaintiff to learn that manufacturing defects—

7  not cleaning equipment, as originally suspected—were to blame.  *See* Dkt. 76, at 2.  Razor

8  claims that although plaintiff knew of the issues early on, when Nordstrom brought them to

9  plaintiff's attention, plaintiff did not initially know that "these issues were present 'prior-to' use

10  in the stores."  Dkt. 76, at 2.  Thus, the parties and Nordstrom spent time investigating whether

11  cleaning equipment was to blame.  Dkt. 76, at 2.  It was only after "many months of

12  involvement," according to plaintiff, that it "discovered that the issue" involved lack of adhesion

13  behind the serging edge.  Dkt. 76, at 3.  Moreover, there is evidence that as late as January 2017,

14  plaintiff was still experimenting with different specifications to solve issues with the rugs,

15  showing that plaintiff did not believe manufacturing defects were to blame.  *See* Dkt 63, at 9

16  (requesting that rugs be made with heavier yarn).

17          Genuine factual issues exist regarding the reasonableness of plaintiff's notification that it

18  believed the rugs were defective.  Thus, the timeliness of notification of a breach is an issue

19  appropriate for decision by a trier of fact, not on summary judgment.

20      **V.  Breach of Contract Claim**

21          The elements of a breach of contract claim that a plaintiff must show are that the contract

22  imposed a duty, the duty was breached, and that breach proximately caused damages to plaintiff.

23  *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 78 Wn. App. 707, 712 (1995); *see also*

24

1   *Larson v. Union Inv. & Loan Co.*, 168 Wash. 5 (1932).  Defendant argues that plaintiff has failed

2   to show that any duty was breached because no rugs failed to meet plaintiff's specifications or

3   had manufacturing defects, and any damage to the rugs was caused by Nordstrom's improper

4   care of the rugs.  Dkt. 59, at 23.  Defendant further argues that plaintiff cannot show damages

5   because in addition to the arguments above, defendant never had to reimburse Nordstrom for any

6   rugs and Nordstrom stopped purchasing rugs from plaintiff for another reason.  Dkt. 59, at 23.

7   Plaintiff responds that there are genuine issues of material fact regarding whether defendant

8   shipped rugs with manufacturing defects.  *See* Dkt. 71, at 3–5.  The Court agrees.

9               **A.  Evidence of Defects in Rugs Before Use**

10          For its part, defendant relies on evidence that Nordstrom's cleaning equipment and high

11  traffic placement of the rugs—not defects in defendant's workmanship during manufacturing—

12  caused damage to the rugs.  *See, e.g.*, Dkt. 64-1, at 10 (defendant's expert's conclusion that the

13  rugs did not have manufacturing defects).  As noted above, defendant has provided evidence that

14  hand-loomed rugs were not appropriate for commercial settings, particularly if subjected to

15  cleaning equipment such as Nordstrom uses.  *See* Dkt. 63, at 4 (McGovern, Jr.'s declaration that

16  hand-tufted rugs are more appropriate for commercial settings); Dkt. 65, at 4 (McGovern, Sr.'s

17  declaration that he would not recommend hand-loomed rugs for high traffic areas surrounded by

18  hard flooring and cleaned with commercial equipment and that in June 2016, he told Razor there

19  was not much else that could be done with a hand-loomed rug).  In addition, McGovern, Jr.,

20  provides evidence that in September 2016, he told Razor that the cleaning methods appeared to

21  be "eat[ing] up" the edges of the rugs and in November 2016 that the serging on the rug edges

22  could not be tightened up any more.  Dkt. 63, at 10; Dkt. 63-4, at 3; Dkt. 63-8, at 2.  Defendant

23  also provides evidence that it appears that other rugs in Nordstrom's stores were having similar

24

1    issues.  *See* Dkt. 60-5, at 10 (email from Razor to a Nordstrom employee referencing issues with

2    rugs including those from another company); Dkt. 65, at 7 (McGovern, Sr.'s declaration that he

3    observed issues with other rugs at a store).  In 2018, according to McGovern, Sr., Razor "agreed

4    with me" that the damage was attributable to cleaning equipment.  Dkt. 65, at 7.

5         Plaintiff, on the other hand, asserts that it has provided evidence of manufacturing defects

6    because "[m]any rugs arrived from [defendant] with existing flaws to the edges and corners."

7    Dkt. 71, at 8.  In plaintiff's view, even if there were other rugs with minor issues, the complete

8    failure of defendant's rugs was due to more fundamental flaws.  *See* Dkt. 76, at 4.

9         Taking plaintiff's evidence as true—including all reasonable inferences therefrom—the

10   Court agrees that plaintiff has come forward with at least some evidence of defects that could not

11   have been caused by high traffic or inappropriate cleaning.  Specifically, Razor stated that he

12   went to twelve stores and believed that because rugs manufactured by defendant and placed in

13   different areas and with different maintenance practices exhibited issues, the issues pre-existed

14   installation in the stores and were confined to defendant's rugs, not those from other

15   manufacturers.  *See* Dkt. 76, at 1–2 (claiming issues with rugs on sides that were not subject to

16   the cleaning equipment that defendant argued was to blame).  Razor also stated that he

17   unwrapped rugs shipped directly from defendant that had flaws.  Dkt. 76, at 3; *see also* Dkt. 76,

18   at 9.  And a Nordstrom employee states that she also observed issues upon receipt of a rug in

19   September 2016.  Dkt. 74, at 3.  The common thread of this evidence is that plaintiff's rugs had

20   pre-existing defects when shipped to Nordstrom stores, so that high traffic and cleaning

21   equipment were not the reasons that the rugs failed.

22        The Court also notes that within defendant's own evidence, factual issues are apparent.

23   Specifically, Hogan testified that "we have a lot of different rugs in [a] store, the bulk of wh[ich]

24

1   are not [defendant's] rugs, and *we have not had the same problem with other rugs in the store*,

2   and they are all maintained in the same way." Dkt. 69, at 9 (emphasis added); *see also* Dkt. 69,

3   at 11 ("[W]e have high traffic stores and every rug that we have in our stores is in a high traffic

4   area[.] . . . It was only these specific rugs that we were having trouble with. . . .").

5          Regarding the employee's declaration about receiving a damaged rug, defendant asserts

6   that it "would not have shipped this rug if it had any damage at a corner" and that the rug at issue

7   "had been placed in the Nordstrom Domain store for at least four months before" the

8   photographs of it were taken, so that it had already been subjected to cleaning. *See* Dkt. 79, at 6.

9   In support, defendant relies on McGovern, Jr.'s supplemental declaration that "[w]e never ship

10  any rug if it had any damage" and that "[e]ven if the store was not yet open, Nordstrom's

11  cleaning machines and autoscrubbers would still have been used on this rug." Dkt. 81, at 6.

12  Defendant also relies on speculation that the rug must have been installed when it arrived at the

13  store or that the manner in which the rug was held "may have" caused the damage. *See* Dkt. 82,

14  at 6. The parties' differing explanations regarding the damage on the rug received at the Domain

15  store creates a material issue of fact barring summary judgment in defendant's favor.

16  Speculation from defendant's expert about what could have happened to cause the damage and

17  when the rug was installed is inadequate to merit granting the summary judgment motion. *See*

18  Dkt. 82, at 6 ("*If* this rug has been in service *as suspected*, damage *could have been caused* by

19  Nordstrom's commercial vacuums. . . ." (Emphasis added.)).

20         Defendant also asserts that the rug used as an example in support of Razor's claim that he

21  unboxed rugs directly from defendant does not in fact have any flaws. Dkt. 79, at 5.

22  Specifically, although Razor asserts that he witnessed a lack of adhesion and the presence of cut

23  weaving ends (Dkt. 76, at 3), defendant's expert states that these flaws do not appear to be

24

present and that, instead, there is merely "an excess of the latex adhesive" on a corner of a rug. Dkt. 82, at 3.  Again, these competing descriptions create factual issues appropriate for a trier of fact to resolve.

Finally, defendant attacks plaintiff's side-by-side comparison photographs of the January 2017-purchased rug sample.  Plaintiff's rely on Razor's comparison photograph of the January 2017 rug sample and a rug from a Nordstrom store showing that the test rug was in good shape even after being "kick test[ed]" by a Nordstrom employee yet the Nordstrom store rug "was damaged beyond repair."  Dkt 76, at 5–6.

Defendant, on the other hand, argues that their own expert inspected the rug sample and found that it had "exactly the same serging that had been applied to [defendant's] lighter weight . . . hand-loomed rugs. . . ."  Dkt. 59, at 25.  Relying on its expert's supplemental declaration, defendant argues,

> the comparison photograph[] has nothing to do with serging yarns, which is the only area of damages on the rugs. . . .  The picture of the test rug shows the monk's cloth has been pulled back off the Action Bac scrim. . . .  Because the Action Back is permanently adhered to the rug[']s weave with latex adhesive, which penetrates into the carpet[']s weave and yarn bundles, pulling back the Action Bac will distort, compromise, or destroy the woven construction of the rug when pulled back, as seen in the picture. . . .  This photograph shows that the latex is of a high quality on the so-called "failed rug" as it is still attached to both the Action Bac and the rug[']s back. . . .  Also, the serging yarn on the "failed rug" show[s] that there are no signs of distortions of [sic] compromise.

Dkt. 79, at 5–6; *see also* Dkt. 82.

Viewing the facts in the light most favorable to plaintiff, there are obvious differences between the sample rug—which was, according to plaintiff, subjected to testing—and the store-used rug.  Whether these differences are attributable to adhesion issues that were not present in the sample rug, as Razor maintains (*see* Dkt. 76, at 3–6), or the difference between removing a

1    "monk's cloth" non-permanent backing and an "Action Bac scrim," as defendant asserts (Dkt.

2    82, at 2–3) is patently a factual issue appropriate for determination by a trier of fact.

3         Finally, in the reply brief, defendant briefly asserts that plaintiff's "breach of contract

4    claim" is really a disguised "breach of the implied warranty of merchantability" claim.  Dkt. 79,

5    at 3.  This argument is first raised in the reply brief, and the Court exercises its discretion not to

6    reach it.  *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008).

7         In short, genuine issues of material fact bar the Court from granting summary judgment

8    dismissal of the breach of contract claim on the basis that the rug issues were due to improper

9    use or cleaning.

10                              **B.  Damages**

11        As noted, defendant also argues as a reason to grant summary judgment dismissal that

12   plaintiff cannot establish a breach of contract claim.  Defendant asserts that plaintiff never had to

13   reimburse Nordstrom for the purchase order deposits that were cancelled and that "the only

14   reason Nordstrom has not ordered rugs from [plaintiff] since 2018 is because Nordstrom changed

15   its design direction and budget"—not any issues with defendant's rugs.  *See* Dkt. 59, at 23.

16   Plaintiff does not address these arguments.

17        Defendant's first argument, regarding the reimbursement of certain purchase orders, is

18   not persuasive.  Defendant argues that "[plaintiff] never reimbursed Nordstrom for any of its

19   deposits on [] four purchase orders[] and instead issued a credit memo to Nordstrom for

20   $70,092.00."  Dkt. 59, at 18.  Defendant does not go into any more detail regarding this.  But it is

21   clear that the referenced credit memo pertained to only four invoices (Dkt. 60-9, at 2), even

22   though McGovern, Jr., identifies at least twenty-one separate purchase orders in his declaration.

23   *See* Dkt. 63, at 11–12; *see also* Dkt. 69, at 16 (the credit memo pertained to cancellations of only

24

1    some of the existing orders).  And Hogan testified that Nordstrom did not merely receive a credit

2    memorandum but also was reimbursed $10,000 by plaintiff regarding these four invoices.  *See*

3    Dkt. 69, at 14–15.  Genuine issues of material fact on this point are therefore readily apparent on

4    this question, so that defendant's argument is not a reason to grant summary judgment dismissal

5    of any claims.  Evidentiary issues can be resolved later.

6         The second argument pertains to damages for the lost future profits/lost sales claims—

7    claims that this Court recommends striking, as discussed above.  *See supra*, part I(B)(1).

8    Therefore, the District Court need not reach this argument.

9         However, in the event that the District Court reaches the question of whether separately,

10   plaintiff can obtain damages for lost profits where Nordstrom allegedly stopped purchasing rugs

11   for other reasons than rug quality issues, this Court disagrees with defendant.  There are genuine

12   issues of material fact related to this issue that are readily apparent on the record.  For example,

13   defendant's own evidence includes a Nordstrom purchasing coordinator's email to Razor that

14   "[i]t has been decided that due to the repeated issues with quality control on our 2017 orders that

15   we would like to CANCEL our FALL 2018 rug orders. . . ."  Dkt. 60-8, at 3.  Hogan wrote,

16   related to this email, that she "can't continue putting problematic products into our stores" and

17   that "[e]ven with repairs and replacement, we are giving our stores an inferior product."  Dkt. 60-

18   8, at 2.  She continued, "[w]e thought we had this worked out with the changed spec for 2017,

19   but the rugs are as challenging as ever."  Dkt. 60-8, at 2.  Thus, although the District Court need

20   not reach the issue, should it do so, it should find that there are genuine issues of material fact

21   regarding the reason that Nordstrom stopped purchasing rugs.

22        **VI.  Breach of Warranty Claims**

23             **A.  Express Warranty Claim**

24

1    Plaintiff brings breach of warranty claims for both breach of express and implied

2    warranties.  *See* Dkt. 1-1.  The Court begins by addressing arguments related to the express

3    warranty claim.  Regarding this claim, defendant argues that it never made any express warranty.

4    Dkt 59, at 23–24.  Plaintiff does not respond.

5    Again, the UCC provides the relevant rule.  RCW 62A.2-313(1)–(2) explains that an

6    express warranty is created as follows:

7    (a) Any affirmation of fact or promise made by the seller to the buyer
     which relates to the goods and becomes part of the basis of the bargain
8    creates an express warranty that the goods shall conform to the affirmation
     or promise.
9    (b) Any description of the goods which is made part of the basis of
     the bargain creates an express warranty that the goods shall conform to the
10   description.
     (c) Any sample or model which is made part of the basis of the
11   bargain creates an express warranty that the whole of the goods shall
     conform to the sample or model.
12   (2) It is not necessary to the creation of an express warranty that the seller
     use formal words such as "warrant" or "guarantee" or that he or she have a specific
13   intention to make a warranty, but an affirmation merely of the value of the goods
     or a statement purporting to be merely the seller's opinion or commendation of the
14   goods does not create a warranty.

15   Defendant points to evidence that defendant never made any affirmation of fact or

16   promise that could amount to an express warranty under this definition.  As defendant points out,

17   plaintiff fails to come forward with evidence tending to describe any express warranty.  *See* Dkt.

18   59, at 24.  Nor is any such evidence apparent in the record.

19   An alternative way in which an express warranty can be created is where a "sample or

20   model which is made part of the basis of the bargain creates an express warranty that the whole

21   of the goods shall conform to the sample or model."  RCW 62A.2-313(1)(c).  On this point,

22   plaintiff asserts that a January 2017 test rug sample that plaintiff ordered from defendant, with

23   the heavier weight yarn and rounded corners, "was materially different than what [defendant]

24

ultimately provided." Dkt. 71, at 8. As noted above, plaintiff relies on Razor's declaration, including a comparison photograph of the sample rug and a rug from a Nordstrom store, showing that the sample rug was in good shape even after being "kick test[ed]" by a Nordstrom employee yet the Nordstrom store rug "was damaged beyond repair." Dkt 76, at 5–6.

As the Court concluded above (*see supra* Part V(A)), viewing the facts in the light most favorable to plaintiff, genuine factual issues exist regarding whether the sample rug was of better quality than the rug used in the store—and by extension, other rugs purchased from defendant. As defendant points out, however, this theory of breach of warranty claim applies only to rugs purchased after the rug sample was provided in February 2017. *See* Dkt. 59, at 24; *see also* Dkt. 63, at 9.

### B. Implied Warranty Claim

Regarding the implied warranty claim, defendant argues that "the evidence shows that [defendant's] hand-loomed rugs are merchantable, with no defects in workmanship or manufacturing[.]" Dkt. 59, at 27. Plaintiff argues that defendant is subject to statutorily implied warranties. Dkt. 71, at 10.

Here, the UCC rule concerning the warranty of merchantability provides—

(1) Unless excluded or modified (RCW 62A.2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
(2) Goods to be merchantable must be at least such as
      (a) pass without objection in the trade under the contract description; and
      (b) in the case of fungible goods, are of fair average quality within the description; and
      (c) are fit for the ordinary purposes for which such goods are used; and
      (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
      (e) are adequately contained, packaged, and labeled as the agreement may require; and
      (f) conform to the promises or affirmations of fact made on the container or label if any.

1    RCW 62A.2-314.

2        Defendant argues that the evidence shows that plaintiff's rugs are merchantable, with no

3    defects in workmanship or manufacturing and that the "usual, intended purpose" of these rugs is

4    "in areas that are not subject to commercial vacuums and autoscrubbers." Dkt. 59, at 27.

5    Defendant argues that the evidence shows that the damage to the rugs was caused by placement

6    in high traffic areas of Nordstrom's stores and the use of improper cleaning equipment. Dkt. 59,

7    at 28. According to defendant, the "rugs would be acceptable when used in a different

8    application and not subject to commercial vacuums and autoscrubbers." Dkt. 59, at 28.

9        But this argument goes to the heart of the factual issues in this matter. Contrary to

10    defendant's argument that plaintiff has "failed to present any evidence to support this claim,"

11    plaintiff has come forward with evidence from which a trier of fact could find that pre-existing

12    manufacturing defects, not the rug placement or cleaning equipment, caused issues with the rugs.

13    Specifically, Razor states that although initially all parties speculated that cleaning equipment

14    was the culprit, "[t]hat early speculation was debunked over[]time by [plaintiff] upon its hands-

15    on and in-depth investigations." Dkt. 76, at 2. Razor asserts that "within each store where

16    different maintenance practices were employed," rugs had issues; that rugs had issues regardless

17    of whether they were adjacent to areas where the cleaning equipment was used; and that rugs had

18    issues upon arrival and unpackaging. Dkt. 76, at 2–4. As discussed in detail above (*supra*, part

19    V(A)), plaintiff has come forward with evidence from which a reasonable trier of fact could

20    conclude that pre-existing defects, not cleaning equipment or traffic, caused issues with the rugs.

21        Therefore, there are genuine issues of material fact regarding whether the rugs were fit

22    for ordinary purposes—i.e. whether even rugs in lower traffic areas, not subjected to the cleaning

23

24

1  equipment at issue, were failing—and defendant's motion for summary judgment dismissal of

2  the implied warranty claim should be denied.

3  **CONCLUSION**

4  The motion to strike (Dkt. 77) is granted solely as relevant to consideration of

5  defendant's summary judgment motion; and the sur-reply (Dkt. 84) and motion to strike the sur-

6  reply (Dkt. 85) are both stricken. The undersigned recommends granting in part and denying in

7  part the summary judgment motion. Dkt. 59. The District Court should deny the summary

8  judgment motion in all respects except that the District Court should strike plaintiff's claim for

9  damages in the form of lost future profits/lost sales and should limit the breach of express

10  warranty claim to rugs purchased after the rug sample was provided in February 2017.

11  Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

12  fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

13  6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

14  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

15  of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

16  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

17  imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **April 16,**

18  **2021** as noted in the caption.

19  Dated this 1st day of April, 2021.

20

21  _____

22  J. Richard Creatura
   Chief United States Magistrate Judge

23

24